McGowan Grain, Inc., a Nebraska corporation, appellant,
v. Ronald D. Sanburg and Darrell Strickler, appellees.

403 N.W.2d 340

Filed April 3, 1987.   No. 85-597.

Robert C. McGowan, Jr., for appellant.

James T. Blazek and Martin Cahill, for appellees.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, Shanahan, and Grant, JJ.

Shanahan, J.

McGowan Grain, Inc., sued Ronald D. Sanburg (Ron Sanburg) and Darrell Strickler in a contract action brought in the district court for Douglas County. After sustaining special appearances by Ron Sanburg and Strickler, the district court

dismissed McGowan's action. We reverse and remand these proceedings.

At the hearing on the special appearances, affidavits provided the background and factual basis on which the court determined there was no personal jurisdiction over Ron Sanburg and Strickler.

In 1981, the Nebraska Grain & Feed Dealers Association published a "grain & feed directory & buyers guide." At page 105 of that publication there appeared the advertisement of Sanburg Co., Inc., "Truck Grain Merchants of the Midwest," informing readers that Sanburg Co. had a toll-free line for customers in states bordering Kansas. The advertisement also stated that Sanburg Co. had an office at McCool Junction, Nebraska. Among the names appearing in the advertisement was "Ron Sanburg." In 1982, substantially the same advertisement appeared in the directory, with the exception of the addition of Darrell Strickler's name and information that Sanburg Co. had a "National WATS" line in addition to a "Kansas WATS" and a toll-free number for "bordering states." That advertisement again appeared in the grain directory in 1983 and 1984. It appears that Sanburg Co. is a Kansas corporation and had its office at Overland Park and, later, Lenexa, in the State of Kansas. McGowan, a Nebraska corporation, was a member of the Nebraska Grain & Feed Dealers Association and operated a commercial grain elevator in Louisville, Nebraska.

Sometimes McGowan's representatives placed telephone calls to Sanburg Co. about prospects of a grain sale. On other occasions, Sanburg Co. telephoned McGowan and inquired whether McGowan was interested in selling grain. Regardless of the source of telephone calls about grain sales, if McGowan had available grain Sanburg Co. mailed duplicate original contracts to McGowan. Pursuant to the established practice between Sanburg Co. and McGowan, one of the mailed duplicate contracts, which had been signed by Sanburg Co., was retained by McGowan, while the other duplicate, which was unsigned by Sanburg Co., was signed by McGowan and mailed to Sanburg Co.'s office in Kansas. Every delivery of contracted grain took place at McGowan's elevator, where the

grain was loaded on Sanburg Co.'s trucks.

Between July 18, 1983, and May 21, 1984, McGowan had 29 separate written contracts for sale of grain to Sanburg Co. Of these 29 contracts, Ron Sanburg, a Kansas resident for approximately 14 years before the McGowan contracts, negotiated and signed 9 contracts on behalf of Sanburg Co. for purchase of 57,582 bushels of McGowan's grain, including 3 contracts during February and March 1984. In September 1983, and during March, April, and May of 1984, Darrell Strickler, who was a Kansas resident employed by Sanburg Co. as a "merchandiser," negotiated and signed four contracts regarding Sanburg Co.'s purchase of 54,000 bushels of grain from McGowan. The last contract obtained by Sanburg Co. through Strickler was dated May 21, 1984, and involved 20,000 bushels of McGowan corn at a price of $3.40 per bushel. All contracted grain was delivered to Sanburg Co.

Throughout Sanburg Co.'s transactions with McGowan, Sanburg Co. did not have a Nebraska grain dealer's license, and neither Ron Sanburg nor Strickler, as employees of Sanburg Co., was licensed by the State of Nebraska as required by Neb. Rev. Stat. § 88-518 (Supp. 1983), which in part provided:

> Any person, firm, cooperative, or corporation, . . . who shall purchase grain from the owner thereof for the purpose of resale, or who shall purchase and transport grain or who shall transport grain in or out of this state for resale, or who shall act as employee or agent of a seller or purchaser of grain, . . . shall first procure a license therefor from the Public Service Commission before transacting such business . . . . Any person violating the provisions of this section shall be guilty of a Class II misdemeanor, and in addition shall be liable for any damages suffered by any person as a result of such violation.

Cf. Neb. Rev. Stat. §§ 75-901 to 75-909 (Reissue 1986) ("Grain Buyer Act").

The records of the Nebraska Public Service Commission, which issues licenses to grain buyers and agents or employees of grain buyers, contained verified documents reflecting that Ronald D. Sanburg (Ron Sanburg) is the president of Sanburg

Co. (In his affidavit, Ron Sanburg acknowledged his presidency of Sanburg Co. from September 1980 to September 13, 1984.) The Public Service Commission records also reflect that the only other officer for Sanburg Co. is Nancy Sanburg, secretary of the corporation. According to the return of summons by the Kansas sheriff, Nancy Sanburg is the wife of Ron Sanburg.

In September 1984, Sanburg Co. was "put into bankruptcy . . . in the United States Bankruptcy Court for the District of Kansas." Because Sanburg Co. failed to pay for the McGowan corn purchased and delivered on May 21, 1984, McGowan, on November 30, 1984, filed suit against Ronald D. Sanburg and Strickler in the district court for Douglas County, alleging the May 21 contract with Sanburg Co.; agency or employment of Ron Sanburg and Strickler in relation to Sanburg Co.; nonpayment for the purchased and delivered corn; nonexistence of a license for Sanburg Co., Ron Sanburg, and Strickler; and liability of Ron Sanburg and Strickler on account of § 88-518.

Nebraska's "long-arm statute," Neb. Rev. Stat. § 25-536 (Reissue 1985), states:

A court may exercise personal jurisdiction over a person:

(1) Who acts directly or by an agent, as to a cause of action arising from the person:

(a) Transacting any business in this state;

(b) Contracting to supply services or things in this state;

(c) Causing tortious injury by an act or omission in this state;

(d) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;

(e) Having an interest in, using, or possessing real property in this state; or

(f) Contracting to insure any person, property, or risk located within this state at the time of contracting; or

(2) Who has any other contact with or maintains any

other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

A summons issued from the Nebraska court was served on Ron Sanburg and on Strickler in Kansas. Ron Sanburg and Strickler, neither of whom had ever been present in Nebraska regarding any McGowan contract, each filed separate special appearances, alleging: "Defendant has had no contact with [Nebraska] and does not maintain any relation with this State sufficient to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States."

After a hearing on the special appearances, the court concluded there was

no jurisdiction over the persons of the individual defendants for the reason that the contacts of the corporate employer with the State of Nebraska may not be charged or imputed to the employees of that corporation who were acting in behalf of that corporation, unless the employees in their individual capacities were transacting business on their own accounts and not on behalf of the corporation. The evidence in this case indicates that the individual employees had no contacts with the State of Nebraska other than within the scope of their employment when they were acting in behalf of the employer. In the Court's view, the statute imposing a derivative liability on the unlicensed and unbonded employees of the corporation does not create a threshhold [sic] for long-arm jurisdiction of this Court.

Thereafter, the district court dismissed McGowan's action. The only question is whether a Nebraska court has acquired personal jurisdiction concerning Ron Sanburg and Strickler.

As the U.S. Supreme Court expressed in *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945):

[D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and

substantial justice."
326 U.S. at 316.

It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. [Citations omitted.] Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. [Citations omitted.]

326 U.S. at 319.

Consequently, our inquiry is whether Ron Sanburg and Strickler had sufficient "minimum contacts" with the State of Nebraska to subject those nonresidents to the jurisdiction of a Nebraska court consistent with the U.S. Constitution. See *York v. York*, 219 Neb. 883, 367 N.W.2d 133 (1985).

Ron Sanburg and Strickler suggest that the "fiduciary shield doctrine" is applicable in the present case and prevents personal jurisdiction over them in Nebraska. The fiduciary shield doctrine may be stated: Personal jurisdiction over a corporate agent or employee cannot be based on jurisdiction over the corporation for which the fiduciary acts, when the individual's activity in the state of the forum is conducted solely as the agent or employee of the corporation. See *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir. 1981). See, also, *Columbia Briargate Co. v. First Nat. Bank*, 713 F.2d 1052 (4th Cir. 1983), *cert. denied* 465 U.S. 1007, 104 S. Ct. 1001, 79 L. Ed. 2d 233 (1984). Although we have not expressly adopted the fiduciary shield doctrine, this court has recognized the general rule that an agent, acting for a disclosed principal, is not ordinarily liable for the principal's contract. See, *State Securities Co. v. Svoboda*, 172 Neb. 526, 110 N.W.2d 109 (1961); *Bury v. Action*

*Enterprises, Inc.*, 197 Neb. 38, 246 N.W.2d 724 (1976); *Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 302 N.W.2d 655 (1981). For reasons expressed later in this opinion, we find that the fiduciary shield doctrine is irrelevant to the question concerning personal jurisdiction over Ron Sanburg and Strickler. We do not have before us and, therefore, make no determination regarding the issue of substantive law, whether one may be held liable in damages as the result of § 88-518.

In *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957), the U.S. Supreme Court examined a situation where a Texas insurance company had mailed a reinsurance certificate to its insured, a California resident, who paid all premiums by mail. The insurance company did not have an office or agent in California and had "never solicited or done any insurance business in California apart from the policy involved here." 355 U.S. at 222. The insurance company was not served with process in California, but was served by registered mail at its principal place of business in Texas. In holding that personal jurisdiction over the insurance company did not amount to a denial of due process, the Court stated:

> [A] trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.
>
> Turning to this case we think it apparent that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent. It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State.

[Citations omitted.] The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable.

355 U.S. at 222-23.

More recently, in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980), service under the Oklahoma long-arm statute raised a question of due process in a products liability case, where a New York resident, who had purchased an Audi in New York, was en route to Arizona in that automobile, when the Audi was struck from the rear and ignited, causing severe burns to one of the plaintiffs. Suit was filed in Oklahoma and included as defendants the Audi's retailer and wholesaler, both of which were New York corporations and neither of which did any business in Oklahoma. In ruling that there were insufficient "contacts, ties, or relations" to sustain personal jurisdiction in Oklahoma concerning the retailer and wholesaler, the U.S. Supreme Court expressed:

The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

The protection against inconvenient litigation is typically described in terms of "reasonableness" or "fairness." . . . The relationship between the defendant and the forum must be such that it is "reasonable . . . to require the corporation to defend the particular suit which is brought there." [Citing and quoting from *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).] Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while

always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute . . . ; the plaintiff's interest in obtaining convenient and effective relief, . . . at least when that interest is not adequately protected by the plaintiff's power to choose the forum . . .; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies [citation omitted].

444 U.S. at 291-92.

Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.

444 U.S. at 295.

When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson v. Denckla*, 357 U.S., at 253, it has clear notice that it is subject to suit there . . . .

444 U.S. at 297. Later, as expressed by the U.S. Supreme Court in *Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694, 703 n.10, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982):

The restriction on state sovereign power described in *World-Wide Volkswagen Corp.*, however, must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and

the Clause itself makes no mention of federalism concerns.

Due process and personal jurisdiction pursuant to a long-arm statute were examined in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-74, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), where the U.S. Supreme Court stated:

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." . . . By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," . . . the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," . . . .

Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). . . . And with respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities. [Citations omitted.]

We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents. A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. [Citation omitted]; see also *Keeton v. Hustler Magazine,*

*Inc., supra,* at 776. Moreover, where individuals "purposefully derive benefit" from their interstate activities, *Kulko v. California Superior Court,* 436 U.S. 84, 96 (1978), it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity. *McGee v. International Life Insurance Co., supra,* at 223.

*Calder v. Jones,* 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), mentioned in *Burger King Corp. v. Rudzewicz, supra,* involved an action for libel. Jones, who lived and worked in California, brought suit in a California court, claiming that an article written by South, Calder's codefendant, and edited by Calder, was libelous. Calder and South, Florida residents, were employees of the National Enquirer, Inc., a Florida corporation. South traveled frequently to California on business but, in writing the questioned article, relied on telephonic information from California sources. Aside from his frequent trips and phone calls, South had no relevant contacts with California. Calder had been to California only twice—once on a pleasure trip, before publication of the subject article, and once after publication to testify in a matter unrelated to the questioned article. Calder had no other relevant contacts with California. As president and editor of the Enquirer, Calder oversaw " 'about every function of the Enquirer.' " 465 U.S. at 786. Recognizing that the California court had personal jurisdiction over Calder and South, the U.S. Supreme Court observed and stated:

> Petitioners argue that they are not responsible for the circulation of the article in California. A reporter and an editor, they claim, have no direct economic stake in their employer's sales in a distant State. Nor are ordinary

employees able to control their employer's marketing activity. The mere fact that they can "foresee" that the article will be circulated and have an effect in California is not sufficient for an assertion of jurisdiction. [Citations omitted.] They do not "in effect appoint the [article their] agent for service of process." [Citation omitted.] Petitioners liken themselves to a welder employed in Florida who works on a boiler which subsequently explodes in California. Cases which hold that jurisdiction will be proper over the manufacturer [citations omitted], should not be applied to the welder who has no control over and derives no direct benefit from his employer's sales in that distant State.

Petitioners' analogy does not wash. Whatever the status of their hypothetical welder, petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. [Citations omitted.] An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually. [Citation omitted.] In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that

basis.

465 U.S. at 789-90. Cf. *Asahi Metal Ind. v. Super. Ct. of Cal., Solano Cty.*, _____ U.S. _____, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987), where the U.S. Supreme Court considered a Taiwanese tire manufacturer's claim for indemnification from a Japanese corporation whose tire valve assembly was incorporated into a motorcycle tire which exploded, causing injury to the motorcycle's operator and death to a passenger on the motorcycle. The product liability claim was settled, leaving the issue of indemnification sought by the Taiwanese corporation. In finding that the Japanese corporation's contacts were insufficient to sustain a California court's personal jurisdiction over that corporation, the Supreme Court noted in *Asahi* at 107 S. Ct. at 1034-35:

> The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.
>
> . . . In the present case, however, the interests of the plaintiff and the forum in California's assertion of jurisdiction over Asahi are slight. All that remains is a claim for indemnification asserted by Cheng Shin, a Taiwanese corporation, against Asahi. The transaction on which the indemnification claim is based took place in Taiwan; Asahi's components were shipped from Japan to Taiwan; Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan.
>
> Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished. . . .
>
> . . . .
>
> Considering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair.

Applying the principles enunciated by the U.S. Supreme

Court regarding due process and personal jurisdiction over a nonresident, we find that both Ron Sanburg and Strickler have sufficient contacts, ties, or relations with the State of Nebraska which are adequate bases for personal jurisdiction exercised by a Nebraska court.

No one disputes that Sanburg Co. has carried on protracted business in Nebraska by substantial and numerous purchases of grain from a Nebraska resident, McGowan. The State of Nebraska clearly considers grain transactions within its borders to be matters of public interest and concern. See, Grain Buyer Act, §§ 75-901 to 75-909; Nebraska Public Grain Warehouse Act, Neb. Rev. Stat. §§ 88-502 to 88-517 (Cum. Supp. 1986). As a more fundamental interest, the State of Nebraska has seen fit to enact a specific code pertaining to sales of personal property within this state, see Neb. U.C.C. §§ 2-101 to 2-725 (Reissue 1980), especially statutory provisions for the passage of title from seller to buyer. See § 2-401. It is inescapable that sales of grain within Nebraska's borders are a matter of substantive policy of this state and, in the event of a dispute concerning any such sale, a matter for efficient judicial resolution in a Nebraska court. Thus, Nebraska "has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

Sanburg Co., in advertising in a Nebraska publication, sought to serve the Nebraska market and very pointedly solicited business from Nebraska residents. Both Ron Sanburg and Strickler signed contracts which Sanburg Co. mailed to McGowan in Nebraska. Pursuant to those contracts, Sanburg Co.'s trucks were obviously dispatched into Nebraska, with the McGowan elevator as their destination, to obtain delivery of McGowan's grain. At the elevator, as the grain was loaded into Sanburg Co.'s trucks, truckload after truckload, title for the contracted corn passed from McGowan to Sanburg Co. See, § 2-401; *Huskinson v. Vanderheiden*, 197 Neb. 739, 251 N.W.2d 144 (1977) (in the absence of a contractual provision, title of goods sold passed on seller's delivery to buyer). Such deliveries of McGowan were products of commercial

transactions having substantial business effects in Nebraska and were consequences of intentional acts directed at Nebraska residents.

Generally, and in the absence of restriction by statute, articles of incorporation, or corporate bylaws, the president of a corporation, by the very nature of that office, is the head of the corporation, its general agent, chief executive officer, and general manager of corporate affairs. See, *Roe v. Bank of Versailles*, 167 Mo. 406, 67 S.W. 303 (1902); *Burlington Industries v. Foil*, 284 N.C. 740, 202 S.E.2d 591 (1974); *Axelrod v. Premier Photo Service*, 154 W. Va. 137, 173 S.E.2d 383 (1970).

Ron Sanburg, as president of Sanburg Co., and, therefore, that corporation's general manager, controlled the day-to-day activities of Sanburg Co. and ostensibly guided corporate activities into Nebraska, such as the advertisements in the grain dealers' directory and dispatch of trucks to haul McGowan's grain delivered pursuant to contracts with Sanburg Co. Both Ron Sanburg and Strickler negotiated and signed several contracts for Sanburg Co.'s acquisition of McGowan's grain in Nebraska over an appreciable period. The intentional actions of Ron Sanburg and Strickler were expressly aimed at Nebraska, that is, contracts with a Nebraska resident. If personal jurisdiction has been upheld concerning nonresident primary participants whose intentional actions allegedly took the good name of a resident of the forum state, see *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), then nonresident primary participants, whose intentional and directed actions allegedly caused a resident of the forum state to part with ownership of tangible property, are subject to personal jurisdiction in the forum of the resident's state, which is precisely the case before us. Both Ron Sanburg and Strickler controlled some marketing activity of Sanburg Co. when they obtained contracts from a Nebraska resident. Thus, both Ron Sanburg and Strickler had direct, deliberate, and purposeful contact with Nebraska.

Moreover, unless we succumb to naivete and accept the very unlikely premise that Ron Sanburg and Strickler gratuitously rendered services for Sanburg Co., both Ron Sanburg and

Strickler received a benefit from their employment and the McGowan contracts, namely, their compensation, whether a salary, commission, or wages, paid by Sanburg Co. In the realities of this case, both Ron Sanburg and Strickler acted in their own interests by carrying out their employment activities aimed into Nebraska at McGowan. At least in part, the compensation paid to Ron Sanburg and Strickler was derived from their conduct of Sanburg Co.'s business in Nebraska. See *Chancellor v. Lawrence*, 501 F. Supp. 997, 1005 (N.D. Ill. 1980) ("sheer fiction" to assume that nonresident employees of nonresident corporation derived no benefit from their activities in the forum state, when such employees received a salary from their corporate employer). Both Ron Sanburg and Strickler "purposefully" availed themselves of the privilege of conducting business activities within Nebraska. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).

Also, we find it is not so burdensome for Ron Sanburg and Strickler, Kansas residents, to defend an action in Nebraska, where business activity took place. Evidence bearing upon delivery of the contracted corn and other evidence concerning McGowan's claim against Ron Sanburg and Strickler undoubtedly is readily and efficiently available from sources in Nebraska. McGowan would suffer a costly and unnecessary disadvantage, if required to secure such evidence in Nebraska for presentation in Kansas. It is, therefore, reasonable and fair to require Ron Sanburg and Strickler to defend the action in Nebraska, which has an available forum for the litigation. See *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957).

In disposing of the contention that the fiduciary shield doctrine precludes personal jurisdiction, we believe that, while such doctrine may have a bearing on substantive liability in some jurisdictions, we must agree with the statement: "Ignoring any notion that acting in a corporate capacity somehow provides the defendant with a jurisdictional shield eliminates unfairness to the plaintiff and permits a systematic application of jurisdictional principles as they are applied in other contexts." Sponsler, *Jurisdiction Over the Corporate*

*Agent: The Fiduciary Shield*, 35 Wash. & Lee L. Rev. 349, 365 (1978). We neither state nor imply that an employee of a corporation may be subjected to personal jurisdiction in any state where the corporate employer does business. However, if a defendant's contacts satisfy the standards imposed by the forum state's long-arm statute and the requirements of due process, the fiduciary shield doctrine does not prevent personal jurisdiction. Rather than misplaced emphasis on the fiduciary shield doctrine as a bar to personal jurisdiction, "the primary focus should be on the defendant's activities without regard to the role in which these activities were entered into. If such activities satisfy minimum contacts analysis, personal jurisdiction should be obtained." Note, *The Fiduciary Shield Doctrine: A Rule of Statutory Construction or a Constitutional Principle?*, 9 J. of Corp. L. 901, 925 (1984). See, also, *Columbia Briargate Co. v. First Nat. Bank*, 713 F.2d 1052 (4th Cir. 1983), *cert. denied* 465 U.S. 1007, 104 S. Ct. 1001, 79 L. Ed. 2d 233 (1984).

Any thought that the fiduciary shield doctrine is a principle pertinent to personal jurisdiction received a constitutional coup de grace administered by the U.S. Supreme Court in *Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), when the Court stated: "Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually." A defendant's conduct or activities in relation to the forum state and its residents, not the defendant's role in or relationship with a corporate employer during occurrence of such conduct or activities, supply the bases for determining whether minimum contacts exist in reference to the forum state. The "fiduciary shield" doctrine is not a constitutional principle precluding personal jurisdiction over a nonresident officer, agent, or employee of a corporation. If a nonresident, as a corporate officer, agent, or employee, has contacts which satisfy standards imposed by a forum state's long-arm statute and the requirements of due process, personal jurisdiction over such nonresident may be obtained in the

forum state.

Consequently, we hold that Ron Sanburg and Strickler have sufficient contacts with the State of Nebraska to justify personal jurisdiction over them in a Nebraska court. We, therefore, reverse the judgment of the district court and remand this matter to the district court for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.