**COMMONWEALTH PROPANE COMPANY, Plaintiff-Appellee (85–3924, 3930, 4028, 4067), Plaintiff-Appellant (85–3931),**

v.

**PETROSOL INTERNATIONAL, INC., Defendant-Appellee (85–3924, 3931), Defendant-Appellant (85–3930, 4067),**

**and**

**Cal Gas Corporation, Defendant-Appellant (85–3924, 4028), Defendant-Appellee (85–3931).**

Nos. 85–3924, 85–3930, 85–3931, 85–4028 and 85–4067.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 2, 1987.

Decided May 11, 1987.

Rehearings Denied June 26, 1987.

Michael J. Boylan, argued, Cohen, Todd, Kite & Stanford, Terrence A. Mire, Cincinnati, Ohio, Stanley M. Fisher, Arter & Hadden, Cleveland, Ohio, for Commonwealth Propane Co.

Karen F. Aronoff, Rhoa, Follen, Rawlin & Johnson Co., Cleveland, Ohio, W. Andrew Hoffman, argued, Albert J. Rhoa, for Cal Gas Corp.

David J. Hooker, argued, Elizabeth B. Wright, Thompson, Hine & Flory, Cleveland, Ohio, for Petrosol Intern.

Before KENNEDY, JONES and NORRIS, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

This diversity action, governed by Ohio law, involves allocation of the risk of loss between sellers and buyers where an underground propane gas storage facility collapsed and the stored gas could no longer be removed. Defendant-appellee Petrosol International, Inc. ("Petrosol") and defendant-appellant Cal Gas Corporation ("Cal Gas") appeal and plaintiff-appellee Commonwealth Propane Company ("Commonwealth") cross-appeals from different portions of a summary judgment allocating such loss and an order regarding prejudgment interest. We REVERSE the District Court's grant of summary judgment to Petrosol against Cal Gas and REMAND the action for entry of summary judgment in favor of Cal Gas. We also REVERSE the District Court's grant of summary judgment for Commonwealth against Petrosol and REMAND the action for determination of whether the transactions between these parties were governed by section 1302.-53(B) or by section 1302.53(D) of the Ohio Revised Code.

## I.

On November 5, 1982, Cal Gas entered into a contract with Petrosol for the sale and delivery of 10,000 barrels of liquid propane gas stored at Lake Underground Storage ("Lake Underground"), a storage facility in Painesville, Ohio. Petrosol agreed to pay $0.57 per gallon for the propane; Cal Gas agreed to deliver the propane on demand on or before March 31, 1983.

Petrosol entered into a contract with Commonwealth on the same day for the sale and delivery of 10,000 barrels of propane at a price of $0.58 per gallon. Again, the propane was to be delivered on demand on or before March 31, 1983.

Petrosol sent Commonwealth a form entitled "Sales Acknowledgment," which Commonwealth accepted on November 22, 1982. Commonwealth paid Petrosol for the propane two days later. Petrosol also sent Cal Gas a form entitled "Purchase Acknowledgment," dated November 5, 1982, which was accepted by Cal Gas on November 22, 1982. After receiving Petrosol's payment, Cal Gas sent a "Confirmation of Distribution" to Lake Underground, indicating a product flow from Cal Gas to

Petrosol and clearing Commonwealth as the carrier to pull the transport loads.

A second transaction, with the same sequence of events, followed. Petrosol purchased an additional 10,000 barrels of propane stored at Lake Underground from Cal Gas on November 18, 1982. Again, the price was $0.57 per gallon and delivery was to occur on demand on or before March 31, 1983. Petrosol sold the 10,000 barrels of propane to Commonwealth on the same date. As in the earlier contract, delivery was to occur on demand on or before March 31, 1983.

Commonwealth accepted Petrosol's Sales Acknowledgment for this second transaction on December 2, 1982. Commonwealth paid for this propane on December 3, 1982. Petrosol sent Cal Gas a Purchase Acknowledgment, which Cal Gas signed on November 30, 1982. After receiving Petrosol's payment, Cal Gas mailed a Confirmation of Distribution to both Lake Underground and Petrosol, indicating a product flow from Cal Gas to Petrosol to Commonwealth and acknowledging a total delivery of 20,000 barrels from Cal Gas to Petrosol.

In February, 1983, a wall in the cavern of Lake Underground collapsed. As a result, the propane was apparently either lost or destroyed before Commonwealth was able to remove it from the storage facility.[1] This litigation arises from that loss.

On December 29, 1983, Commonwealth filed a complaint in the United States District Court for the Northern District of Ohio for damages based on breach of contract against both Cal Gas and Petrosol. Petrosol answered that the propane had been delivered to Commonwealth and that Commonwealth thus bore the risk of loss. Petrosol also cross-claimed against Cal Gas, contending that Cal Gas had not delivered the propane to it and that the risk of loss thus fell on Cal Gas. Cal Gas answered Petrosol's cross-claim by stating that the risk of loss had passed to Petrosol since Cal Gas had tendered delivery of the pro-

pane to Petrosol. Cal Gas answered Commonwealth's complaint by asserting the same defenses it had raised against Petrosol in its answer to Petrosol's cross-claim. Cal Gas also asserted that Commonwealth lacked privity of contract with Cal Gas. Cal Gas then cross-claimed against Petrosol, alleging that it had fully performed its contract with Petrosol and that any damages suffered by Commonwealth resulted solely from Petrosol's breach or omissions. Petrosol answered that either Cal Gas or Commonwealth, but not Petrosol, bore the risk of loss as to the propane.

Following the filing of motions for summary judgment by the parties, the District Court issued an Order and Opinion on September 30, 1985. It granted Commonwealth summary judgment against Petrosol in the amount of $487,200 and Petrosol summary judgment against Cal Gas in the amount of $478,800. All other motions were denied and Cal Gas was ordered to pay costs.

On October 24, 1985, Petrosol filed a Motion for Relief from Judgment, requesting that the sum of $487,200 be corrected to $483,000. On October 28, 1985, Commonwealth filed a Motion to Correct the Judgment pursuant to Rule 60(a), asking for the same correction and seeking an additional award of prejudgment interest. On November 27, 1985, the District Court issued an Order and Opinion granting Petrosol's Motion for Relief from Judgment and awarding prejudgment interest against Petrosol for Commonwealth, and against Cal Gas for Petrosol.

These appeals followed.

## II.  RISK OF LOSS

The main issue in this case is which company bore the risk of loss as to the propane stored at Lake Underground. The Uniform Commercial Code ("UCC") as adopted in Ohio applies to this case. Ohio Rev.Code Ann. § 1302.53 (Anderson 1979) governs the shifting of the risk of loss

---

**1.** Commonwealth apparently was able to remove an undisclosed amount of propane from Lake Underground after the collapse. However, Commonwealth allocated all of the re- moved propane to another company from which it had purchased propane stored at this facility. It did not allocate any to Petrosol.

**526**

where, as here, there has been no breach by the seller.[2]

## A. Cal Gas/Petrosol Transactions

██ The District Court granted summary judgment to Petrosol in the Cal Gas/Petrosol transactions. It rejected Cal Gas' contention that these transactions were governed by Ohio Rev.Code Ann. § 1302.-53(B) and instead found that the parties had a "contrary agreement" within the meaning of section 1302.53(D), which placed the risk of loss on Cal Gas.

In reaching this conclusion, the District Court relied on Paragraph 3 of the Purchase Acknowledgments, which stated:

Deliveries shall be made as, when and where specified on the reverse hereof. Title to products delivered shall pass to Buyer upon completion of loading thereof into tank trucks furnished by Buyer, upon delivery thereof in a tank car to carrier, upon arrival thereof in a tank truck furnished by Seller alongside unloading facilities at destination, or as specified on the reverse hereof, as the case may be.

*See* Joint Appendix at 17 & 21. The District Court found that, in accordance with this paragraph, title did "not pass to [Petrosol] until 'completion of loading' into [Petrosol's] truck, tank car, or P.T.O., F.O.B. in Painesville, Ohio, at any time from November 5, 1982, through March 31, 1983." Joint Appendix at 246. The District Court found these terms "consistent with industry custom and practice," Joint Appendix at 246, and concluded that since the propane was never loaded into either party's trucks or cars, Cal Gas had retained the risk of loss as to the propane lost at Lake Underground in February, 1983. The Court specifically rejected Cal Gas' argument that its dealings with Petrosol were governed by section 1302.53(B). Rather, the District Court found that the presence of the term on the front of the second Purchase Acknowledgment stating "HOW DELIVERED Truck, tank car or P.T.O." indicated that the parties intended that the propane be moved for delivery to occur, and that section 1302.53(D) thus controlled the transactions.

We disagree. Rather, we find that Paragraph 3 did not constitute a "contrary agreement" reallocating the risk of loss between the parties within the meaning of section 1302.53(D). Paragraph 3 refers only to passage of *title* and does not mention passage of *risk of loss*. As the Supreme Court of Ohio has noted, passage of title is irrelevant to passage of risk of loss:

No longer is the question of title of any importance in determining whether a buyer or a seller bears the risk of loss. It is true that the person with title will also (and incidentally) often bear the risk that the goods may be destroyed or lost; but the seller may have title and the buyer the risk, or the seller may have the risk and the buyer the title. In short, title is not a relevant consideration in

---

**2.** This section provides:

§ 1302.53 (UCC 2–509) **Risk of loss in absence of breach.**

(A) Where the contract requires or authorizes the seller to ship the goods by carrier:

(1) if it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though the shipment is under reservation as provided in section 1302.49 of the Revised Code; but

(2) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.

(B) Where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer:

(1) on his receipt of a negotiable document of title covering the goods; or

(2) on acknowledgment by the bailee of the buyer's right to possession of the goods; or

(3) after his receipt of a non-negotiable document of title or other written direction to deliver, as provided in division (D)(2) of section 1302.47 of the Revised Code.

(C) In any case not within division (A) or (B) of this section, the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.

(D) The provisions of this section are subject to contrary agreement of the parties and to the provisions of sections 1302.40 and 1302.54 of the Revised Code.

Ohio Rev.Code Ann. § 1302.53 (Anderson 1979).

deciding whether the risk has shifted to the buyer.

*Hughes v. Al Green, Inc.*, 65 Ohio St.2d 110, 114, 418 N.E.2d 1355, 1357 (1981) (emphasis omitted) (quoting Nordstrom, *Sales* § 130, at p. 393). *See also* Ohio Rev.Code Ann. § 1302.42 (Anderson 1979) ("[T]he rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties appl[y] irrespective of title to the goods" except where otherwise specifically provided.) Thus, Paragraph 3 cannot be said to alter the risk of loss as between Cal Gas and Petrosol.

Nor do we find that any of the other terms and provisions of the Purchase Acknowledgments constituted a "contrary agreement" within the meaning of the UCC. Both Purchase Acknowledgments indicated that the "delivery point" was "Lake Underground Storage, Painesville, Ohio," that the "price" was "$0.5700 USF [3]/USG [4] F.O.B. Painesville," and that the "time of delivery" ran through March 31, 1983. The first Purchase Acknowledgment stated "N/A" after the caption "how delivered." "Truck, tankcar or P.T.O." followed the "how delivered" caption on the second Purchase Acknowledgment. The first form noted that "[s]torage through March 31, 1983 is included at no additional cost."

■ We do not believe that the presence of the "how delivered" term on the face of the second Purchase Acknowledgment indicated that the parties intended the propane to be moved for delivery to occur. First, the term appears only on the second Purchase Acknowledgment, and not on the first. Second, the "delivery point" was stated on both forms to be "Lake Underground Storage, Painesville, Ohio." Thus, the propane was already at its delivery point when Cal Gas and Petrosol entered into their transactions. Most importantly, however, Petrosol immediately (on the same day) resold the propane to Commonwealth with an agreement that it would provide storage at Lake Underground until March 31, 1983. Clearly, Cal Gas and Pe-

trosol contemplated that, as between them, the propane would not be moved.

Section 1302.53(B) addresses goods in the hands of a bailee which are "to be delivered without being moved." Cal Gas contends that the transactions between it and Petrosol are covered by this section. Under section 1302.53(B)(3), risk of loss as to such goods passes to the buyer when the buyer receives a "non-negotiable document of title or other written direction to deliver, as provided in" section 1302.47(D)(2). This latter section states that where goods are held by a bailee and are to be delivered without being moved, "tender to the buyer of a non-negotiable document of title or of a written direction to the bailee to deliver is sufficient tender unless the buyer seasonably objects...." Ohio Rev.Code Ann. § 1302.47(D)(2) (Anderson 1979).

We agree with Cal Gas that this propane was in the hands of a bailee and, as between Cal Gas and Petrosol, was to be delivered without being moved. The facts reveal that Petrosol resold the propane to Commonwealth on the same day that it purchased the propane from Cal Gas. Moreover, Petrosol's Sales Acknowledgments to Commonwealth indicated that the "delivery point" was "Painesville, Ohio" (the location of Lake Underground), and that "[s]torage through March 31, 1981 [was] included at no charge." Clearly, then, Petrosol had no intent to move the propane before it was resold to Commonwealth.

The transactions between Cal Gas and Petrosol thus were governed by section 1302.53(B). The risk of loss passed to Petrosol, the buyer, upon Cal Gas' tender and Petrosol's receipt of a "written direction to deliver." Ohio Rev.Code Ann. § 1302.-53(B)(3). Cal Gas contends that it fulfilled this requirement when it sent Confirmations of Distribution to both Petrosol and Lake Underground.

■ We need not concern ourselves with whether these documents were sufficient to fulfill the requirements of section 1302.-47(D)(2), since Petrosol clearly accepted Cal

---

**3.** "USF" means "United States Funds."

**4.** "USG" means "United States Gallons."

Gas' tender of delivery. Petrosol immediately resold the propane to Commonwealth, an act which is so inconsistent with the seller's ownership as to constitute acceptance within the meaning of Ohio Rev.Code Ann. § 1302.64(A)(3) (Anderson 1979). Official Comment 4 to this section states that "any action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance." *See also In re Pennsylvania Tire Co.*, 26 B.R. 663, 676 (N.D.Ohio 1982) (applying Ohio law) ("A contract buyer has performed an act inconsistent with a seller's ownership of specific goods by offering to resell those goods; such an act constitutes an acceptance of goods."). Having accepted the propane, Petrosol was no longer permitted to reject it. *See* Ohio Rev.Code Ann. § 1302.65(B) (Anderson 1979) ("Acceptance of goods by the buyer precludes rejection of the goods accepted...."). Moreover, Petrosol was not entitled to revoke its acceptance under these circumstances. Ohio Rev.Code Ann. § 1302.66(B) (Anderson 1979) states: "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and *before any substantial change in condition of the goods which is not caused by their own defects.*" (Emphasis added.) Even assuming that Petrosol had valid grounds for revoking its acceptance as provided in Ohio Rev.Code Ann. § 1302.66, the destruction of the propane by the cavern's collapse was a "substantial change" in the propane's condition which was not caused by a defect in the propane itself and which would preclude such revocation.

We thus find that, as between Cal Gas and Petrosol, the propane was held by a bailee to be delivered without being moved and that the risk of loss passed to Petrosol in accordance with section 1302.53(B)(3). Therefore, we REVERSE the District Court's grant of summary judgment to Petrol and REMAND the case with directions to enter summary judgment in favor of Cal Gas instead.[5]

**B. Petrosol/Commonwealth Transactions**

The District Court found that the Sales Acknowledgments between Petrosol and Commonwealth also contained a "contrary agreement" within the meaning of section 1302.53(D), which shifted the risk of loss to Petrosol. Unlike the Purchase Acknowledgments, the Sales Acknowledgments did make specific reference to the passage of risk of loss. Paragraph 5 of these forms stated:

Title to products delivered shall pass to Buyer upon completion of loading the same into tank trucks, upon delivery of products in a tank car to carrier, upon delivery thereof in a tank truck furnished by Seller alongside Buyer's storage facilities at destination, or as stipulated on the face hereof, as the case may be. Thereafter Buyer shall bear all risk of and be solely liable for any loss or damage caused by or attributable to said products, or to their transportation, care, handling, resale or use.

*See* Joint Appendix at 25 & 29.

Beside the "to be delivered in" caption on the front of the form there were five boxes, indicating different types of delivery methods (buyer's tank trucks or cars, seller's tank trucks or cars, or pipeline PTO). None of these boxes were checked on either form. In addition, both Sales Acknowledgments indicated that the "delivery point" was "Painesville, Ohio," that the stated price was "F.O.B. Lake Underground Storage," that the "time of delivery" ran from the date of the respective Sales Acknowledgment through March 31, 1983, and that: "Full payment is due during November 1982. Storage through March 31, 1983 is included at no charge."

The District Court found that Paragraph 5 "specifically covered" the passage of title and risk of loss as between Petrosol and Commonwealth. The Court rejected Petrosol's argument that since none of the boxes

---

5. Because of our disposition of this issue, we do not need to address the other issues raised by

Cal Gas in its brief.

on the front of the contract indicating the means of delivery were checked, the parties intended the goods to be delivered without being moved. Rather, the District Court chose a means of delivery by process of elimination. It noted that one of the boxes indicated "pipeline PTO," which was inapplicable here as neither party had a pipeline. "Seller's trucks or cars" was also inapplicable, because the price term only required Petrosol to provide the propane F.O.B. at Lake Underground, not to deliver it elsewhere. Thus, the District Court found that "[t]he only possible means of delivery remaining [was] 'Buyer's trucks or cars,'" Joint Appendix at 247, and that the deposition of Commonwealth's then president revealed that these methods of delivery were contemplated by the parties. The District Court therefore found that, under the provisions of the Sales Acknowledgments, "the risk of loss [did] not pass to [Commonwealth] until 'completion of loading' into [Commonwealth's] tank trucks or tank cars, F.O.B. Lake Underground Storage, at any time from November 5, 1982, through March 31, 1983." Joint Appendix at 245–46. Since no propane was ever loaded into Commonwealth's trucks or cars, the District Court found that the risk of loss remained with Petrosol.

We begin by noting that the allocation of risk of loss between Petrosol and Commonwealth is far less clear than the allocation of risk of loss between Cal Gas and Petrosol. In the latter transactions, the immediate resale of the propane by Petrosol and Petrosol's agreement to provide long-term storage for its buyer clearly indicated that Cal Gas and Petrosol contemplated that, as between them, the propane was to be delivered without being moved.

■ As between Petrosol and Commonwealth, however, the transactions are less clear. If one of the delivery methods mentioned in Paragraph 5 or indicated by the five boxes was intended by the parties to occur, then the parties had a contrary agreement within the meaning of section 1302.53(D) reallocating the risk of loss. However, since the parties never selected a delivery method on the Sales Acknowledg-

ment forms, we cannot be certain which, if any, of the methods were contemplated by them. The fact that Petrosol provided free storage for approximately five months is some evidence that the propane was in the hands of a bailee and was to be delivered without being moved, as Petrosol contends. In light of such a factual dispute, this issue is not suitable for summary judgment, and we therefore remand it to the District Court for determination as to whether any of the methods of delivery listed in the Sales Acknowledgments were intended to apply or whether delivery to the bailee was all the delivery contemplated by the parties.

■ Commonwealth raises several issues regarding the requirements of section 1302.53(B), which we now address. First, Commonwealth argues that even if the transactions between it and Petrosol are governed by section 1302.53(B), Petrosol retains the risk of loss because the copies of Cal Gas' Confirmations of Distribution that it received did not satisfy the requirements of section 1302.53(B)(3). This section provides that risk of loss passes to the buyer upon "his receipt of a non-negotiable document of title or other written direction to deliver." Commonwealth contends that this documentation must come from the buyer's *immediate* seller—in this case, Petrosol. However, the UCC imposes no such requirement. Section 1302.53(B)(3) refers only to the buyer's *receipt* of a written direction; it is silent as to who must send it. Commonwealth received documentation that the bailee had received notification from its bailor to allow Commonwealth to pull the propane. Since the purpose of the requirement is to show the buyer that the bailee has been informed of the buyer's rights, we see no reason why the directions must come directly from the buyer's seller, as opposed to anyone else who has a right to control the bailee. Whether the Confirmations of Distribution were otherwise adequate written directions to deliver is a factual matter to be determined on remand.

■ Second, Commonwealth argues that it did not have a reasonable time to accept the tender under section 1302.47(D)(2).

This section provides: "Where goods are in the possession of a bailee and are to be delivered without being moved ... tender to the buyer of ... a written direction to the bailee to deliver is sufficient tender *unless the buyer seasonably objects ....*" (Emphasis added.) Commonwealth contends that since the delivery period ran until March 31, 1983, its time for "seasonably objecting" to the tender also ran to that date. We find this argument to be without merit. According to Ohio Rev. Code Ann. § 1301.10(C) (Anderson 1979), "[a]n action is taken 'seasonably' when it is taken at or within the time agreed or *if no time is agreed at or within a reasonable time.*" "What is a reasonable time for taking any action depends on the nature, purpose, and circumstances of such action." Ohio Rev.Code Ann. § 1301.10(B) (Anderson 1979). Section 1302.47(D)(2) states that "risk of loss of the goods and of any failure by the bailee ... to obey the direction remains on the seller until the buyer has had a reasonable time to present the ... direction...." As Official Comment 6 to this section indicates, "[p]aragraph (2) of division (D) adopts the rule that between the buyer and the seller the risk of loss remains on the seller *during a period reasonable for securing acknowledgment of the transfer from the bailee ....*" (Emphasis added.) Thus, the buyer is entitled only to sufficient time to determine whether the bailee intends to recognize the buyer's rights. We cannot tell from the record when Commonwealth received its copies of the Confirmations of Distribution; therefore, whether Commonwealth had sufficient time to object to the copies of the Confirmations and to ascertain whether the bailee would recognize them as factual issues to be determined on remand.

■ Third, Commonwealth argues that the bailee's efforts in lifting the propane from the underground cavern to a surface loading platform is sufficient "movement" to render section 1302.53(B) inapplicable. We have been unable to find, and the parties have been unable to provide us with, any case law defining the meaning of "moved" within the context of section 1302.53(B). However, Official Comment 4 to section 1302.53 provides a valuable hint as to the meaning of the term: "Where the agreement provides for delivery of the goods as between the buyer and seller *without removal from the physical possession of a bailee,* the provisions on manner of tender of delivery apply on the point of transfer of risk."

We are confident that Commonwealth's interpretation of "moved" is wrong. Indeed, that interpretation would render section 1302.53(B) meaningless, since all goods must undergo some movement when being transferred from the possession of the bailee to the buyer. Gasoline must be taken from a tank or other storage facility; grain must be released from an elevator; and packaged goods must be moved from a warehouse. "Moved" must mean a movement greater than such minimal efforts. We hold that goods are not moved for the purposes of section 1302.53(B) where they remain in the physical possession of the bailee at the facility where they were stored.

Finally, Petrosol argues that there is a factual issue as to the amount of damages, if any, Commonwealth suffered. Commonwealth admits that it did extract some propane from Lake Underground after the collapse. However, it attributed all of the propane to another of its suppliers, rather than prorating it among all of its suppliers, including Petrosol, who had stored propane at Lake Underground. Petrosol contends that such proration was required, and that Commonwealth's failure to do so inflated the damages attributable to Petrosol.

If, on remand, it is determined that Commonwealth bore the risk of loss as to the propane, the necessity for proration will, of course, not be an issue. If, however, it is found that Petrosol bore the risk of loss as to the propane, then this issue must be addressed.

The UCC does not discuss the buyer's duty to minimize its damages in circumstances such as these. However, Ohio Rev.Code Ann. § 1301.03 (Anderson 1979) provides that, unless displaced by particu-

lar provisions of the UCC as adopted in Ohio, general principles of law and equity supplement the UCC provisions. "This means that basic common-law principles will continue to govern commercial transactions so long as they do not conflict with the express provisions of the Code." 48 Ohio Jur.2d, *Sales* § 8, at p. 24 (1966). In Ohio,

> [t]he rule requiring one injured by a wrongful act or omission of another to minimize the damages resulting does not require a party to make extraordinary efforts, or to do what is unreasonable or impracticable. Ordinary and reasonable care, diligence and prudence are the measure of the duty. The efforts of the injured party to prevent or lessen his damages include a reasonable expenditure of money as part of his damages.

*Foust v. Valleybrook Realty Co.*, 4 Ohio App.3d 164, 168, 446 N.E.2d 1122, 1127 (1981) (citations omitted). *See also F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.*, 47 Ohio St.2d 154, 160, 351 N.E.2d 121, 125 (1976) (The aggrieved party's recovery of damages "is limited to only those damages arising from the breach which could not, by reasonable effort on his part without undue risk or expense, have been averted or reduced.").

■ On remand, the District Court must decide whether Commonwealth's risk and expense in extracting this propane was reasonable, or whether it was so great as to obviate Commonwealth's duty to minimize its damages. If Commonwealth had no duty to minimize its damages, then it was entitled to hold the propane for its own account, and was not required to prorate it among all the suppliers. If Commonwealth did have such a duty, however, then that duty extended equally to all of its suppliers who had stored propane at Lake Underground for its benefit. Although we have been unable to locate any case law on proration of recovered fungible goods, and the parties have provided us with none, we see no way for Commonwealth to fulfill its duty to minimize its damages as to each

supplier except by prorating the recovered propane among them.

Accordingly, we REVERSE the District Court's grant of summary judgment to Commonwealth and REMAND the action for further proceedings.[6]

### III. COMMONWEALTH'S CLAIM AGAINST CAL GAS

■ Commonwealth argues that it was entitled to a joint and several judgment against Cal Gas and in favor of both Petrosol and Commonwealth in the amount of $478,800. Commonwealth asserts that Cal Gas had actual notice that Petrosol immediately resold the propane to Commonwealth, that Commonwealth was an intended beneficiary of the transactions, and that Commonwealth had a substantial property interest in the propane at Lake Underground and in the proceeds of the two transactions between Cal Gas and Petrosol. Commonwealth thus contends that it is entitled to restitution from Cal Gas of the proceeds of the Petrosol/Cal Gas transaction.

Commonwealth's argument is without merit. Under Ohio law, "[a] third party beneficiary is one for whose benefit a promise has been made in a contract but who is not a party to the contract." *Chitlik v. Allstate Ins. Co.*, 34 Ohio App.2d 193, 196, 299 N.E.2d 295, 297 (1973). "[I]t must be shown that the contract was made and entered into with the intent to benefit the third person. A mere incidental or indirect benefit is not sufficient to give him a right of action." *Id.* (citations omitted). Thus, "[a] third person not a party to a contract has no rights as a third-party beneficiary where the contracting parties did not intend to create third-party beneficiary rights." *Construction Advancement Program v. A. Bentley & Sons Co.*, 45 Ohio App.2d 13, 17, 340 N.E.2d 849, 853 (1975) (citations omitted). We find no evidence that Commonwealth was an intended beneficiary of the contract between Cal Gas and

---

**6.** Cal Gas and Petrosol also challenge the District Court's decision to award prejudgment interest to the parties on a postjudgment motion.

Because of our preceding holdings, we need not address this issue.

**532**

Petrosol. Commonwealth thus is entitled to no recovery from Cal Gas on this theory.

### IV.

Accordingly, we REVERSE the District Court's grants of summary judgment to Petrosol against Cal Gas and to Commonwealth against Petrosol. We REMAND the case with directions to enter judgment for Cal Gas and for further proceedings consistent with this opinion.