**COMMONWEALTH PETROLEUM CO.,**
Plaintiff--Appellant,

v.

**PETROSOL INTERNATIONAL, INC.,**
Defendant--Appellee.

No. 89–3381.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 8, 1990.

Decided April 23, 1990.

As Amended on Denial of Rehearing
June 5, 1990.

Michael J. Boylan (argued), Cohen, Todd, Kite & Stanford, Cincinnati, Ohio, for plaintiff-appellant.

David J. Hooker (argued), Thompson, Hine & Flory, Cleveland, Ohio, for defendant-appellee.

Before JONES and MILBURN, Circuit Judges, and BELL, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Plaintiff, Commonwealth Petroleum Co., appeals the district court's judgment for defendant, Petrosol International, Inc., in this breach of contract action. For the following reasons, we affirm.

I.

Petrosol, a wholesale marketer and distributor of petroleum products, acts as a middleman between gas line producers and gas distributors. Since it immediately resells the propane that it purchases, Petrosol does not have its own storage facilities. Commonwealth, also a marketer and distributor, does have such storage facilities and reserves much of the liquid propane

---

\* The Honorable Robert Holmes Bell, United States District Judge of the Western District of Michigan, sitting by designation.

gas it purchases for resale on a later date. On November 5, 1982, Cal Gas Corporation, a propane supplier, entered into a contract with Petrosol for the sale and delivery of 10,000 barrels of propane stored at Lake Underground Storage (Lake Underground), a storage facility in Painsville, Ohio. Petrosol agreed to pay $0.57 per gallon for the propane; Cal Gas agreed to deliver the propane on demand on or before March 31, 1983. Petrosol sent Cal Gas a "Purchase Acknowledgement," accepted by Cal Gas on November 22, 1982.

Petrosol entered into a contract with Commonwealth on the same day for the sale and delivery of 10,000 barrels of propane at a price of $0.58 per gallon. Again, the propane was to be delivered on demand on or before March 31, 1983. Petrosol sent Commonwealth a form entitled "Sales Acknowledgement," which Commonwealth accepted on November 22, 1982. Commonwealth paid Petrosol for the propane two days later. Subsequently, Cal Gas sent a "Confirmation of Distribution" to Lake Underground, indicating a product flow from Cal Gas to Petrosol and clearing Commonwealth as the carrier to pull the transport loads. A second transaction for an additional 10,000 barrels of propane followed, with the same sequence of events. The two checks made by Commonwealth to Petrosol totalled $483,000.00.

Both Sales Acknowledgements indicated that the "delivery point" was "Painsville, Ohio;" that the stated price was "$0.58 USF/USG F.O.B. Lake Underground Storage;" that the "time of delivery" ran from the date of the respective Sales Acknowledgement through March 31, 1983; and that: "Full payment is due during November 1982. Storage through March 31, 1983 is included at no charge." In addition, beside the "to be delivered in" caption on the front of the form, there were five boxes indicating different types of delivery methods (buyer's tank trucks or cars, seller's tank trucks or cars, or pipeline PTO). None of these boxes were checked on either form. David Tkachuk, a salesman for Petrosol, testified at the trial that he did not check any of the boxes because "[the propane] was being sold without being

physically moved." J.App. at 255–56. Therefore, none of the methods listed in the boxes were applicable.

The Sales Acknowledgements did make specific reference to the passage of risk of loss. Paragraph 5 of these forms stated:

Title to products delivered shall pass to Buyer upon completion of loading the same into tank trucks, upon delivery of products in a tank car to carrier, upon delivery thereof in a tank truck furnished by Seller alongside Buyer's storage facilities at destination, or as stipulated on the face hereof, as the case may be. Thereafter Buyer shall bear all risk of and be solely liable for any loss or damage caused by or attributable to said products, or to their transportation, care, handling, resale or use.

*Id.* at 50. Both of the Sales Acknowledgements were signed by Jim Williams of Commonwealth and subsequently returned to Petrosol. After receipt of the signed forms, Nancy Dreher, Petrosol's Manager of Accounting and Distribution, forwarded invoices to Commonwealth for payment. These invoices bear the notation "shipped via[:] Inventory Transfer." *Id.* at 110 & 112. Williams initialed one of the invoices for payment. During the winter months of 1982 and 1983, Commonwealth treated the propane as its inventory for future use in its projection figures.

In February 1983, a wall in the cavern of Lake Underground collapsed. As a result, the propane was apparently either lost or destroyed before Commonwealth was able to remove it from the storage facility. Commonwealth did recover some propane from the storage tank, but decided to credit it to other parties. Commonwealth subsequently sued both Petrosol and Cal Gas in the United States District Court for the Northern District of Ohio, Judge Alvin I. Krenzler presiding. The district court issued an order entering summary judgment for Petrosol against Cal Gas and for Commonwealth against Petrosol. The Sixth Circuit then issued an opinion reversing and granting judgment to Cal Gas against Petrosol, and reversing and remanding the judgment to Commonwealth against Petro-

sol for more fact-finding. *Commonwealth Propane Co. v. Petrosol International, Inc.*, 818 F.2d 522 (6th Cir.1987).

With respect to the claims between Petrosol and Cal Gas, this court granted judgment to Cal Gas on the grounds that the propane was held by a bailee with the risk of loss passing to Petrosol. In addition, this court reversed the district court's judgment for Commonwealth against Petrosol, noting that it was not clear what method of transfer the parties intended. If the parties intended the transactions to be inventory transfers, then this court hinted that the risk of loss would be with Commonwealth. This court also stated that if there is evidence that the parties intended delivery by one of the methods indicated in the boxes on the Sales Acknowledgement form, then there would be a contrary agreement under Ohio Rev.Code § 1302.53(D) (Baldwin 1988), therefore placing the risk on Petrosol. Though this court remanded the instant case to the district court for such a factual determination, it did note that "[t]he fact that Petrosol provided free storage for approximately five months is some evidence that the propane was in the hands of a bailee and was to be delivered without being moved, as Petrosol contends." 818 F.2d at 529. On remand, the district court found that "the propane was to be delivered to Commonwealth in the hands of the bailee [Lake Underground] without being moved"—an inventory transfer. J.App. at 39. As such, the district court held that pursuant to Ohio law, the risk of loss had passed to Commonwealth.

## II.

Commonwealth first argues that the district court's finding that the transactions were inventory transfers was clearly erroneous. Fed.R.Civ.P.Rule 52(a) states that "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the en-

tire evidence is left with the definite and firm conviction that a mistake has been committed." *American Postal Workers Union v. United States Postal Service*, 871 F.2d 556, 561 (6th Cir.1989) (citations omitted).

Under Ohio law, the risk of loss would be on Commonwealth if the transactions were inventory transfers unless there was an agreement to the contrary by the parties. Ohio Rev.Code § 1302.53 (UCC 2–509) provides:

(B) Where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer.

(1) on his receipt of a negotiable document of title covering the goods; or

(2) on acknowledgement by the bailee of the buyer's right to possession of the goods; or

(3) after his receipt of a non-negotiable document of title or other written direction to deliver....

\* \* \* \* \* \*

(D) The provisions of this section are subject to contrary agreement of the parties and to the provisions of sections 1302.40 and 1302.54 of the Revised Code.

■ The district court found that the parties intended the transactions to be inventory transfers based on several factors: (1) Tkachuk of Petrosol testified that he did not check any of the five boxes on the Sales Acknowledgement relating to methods of delivery because the transactions were inventory transfers, for which no box existed; (2) Williams of Commonwealth made no changes in the method of delivery in the Sales Acknowledgement, even though he had a practice of making changes in a written contract that did not conform to his understanding of the deal; (3) Commonwealth knew at the time of the contract the propane was in storage at Lake Underground, as it received the two confirmations of distribution stating that the product flow was from Cal Gas to Petrosol to Commonwealth; (4) Williams admitted that upon receipt of the confirmations, Commonwealth had the right to pick up the propane at any time—in fact, during the winter of 1982 and 1983, Common-

wealth treated the propane as a reserve in its own projection figures because it was "counting on it to be part of its supply"; (5) as part of the transactions, Petrosol provided Commonwealth "free storage," evidence that the propane was in the hands of a bailee to be delivered without being moved; (6) Petrosol invoiced Commonwealth promptly after each contract was signed, and each invoice described the transaction as an "inventory transfer" and one was initialed by Commonwealth; and (7) Commonwealth entered into another transaction to purchase propane at Lake Underground, similar to the purchase from Petrosol, and treated it as "inventory."

Commonwealth argues that the district court's finding was improper for three reasons. First, it contends that the evidence of an intended inventory transfer is inadequate. It notes that the Sales Acknowledgement forms make no mention of an inventory transfer. Commonwealth also alleges that Williams' initialing of the invoices was not an admission that they were "inventory transfers" as mentioned on the form; instead, it was signed solely for the purpose of paying the invoices. Moreover, Commonwealth relies upon the testimony of Stan Smith, the President of Petrosol, who admitted that an inventory transfer would not have a delivery term providing for delivery over a period of months, as in the instant case. Second, Commonwealth argues that Petrosol previously established a different course of dealing between the parties. In a similar sale of propane in Bath, New York by Petrosol to Commonwealth in October 1982, Tkachuk checked the box "PTO Pipeline" in a transaction which both parties agreed was an inventory transfer. Tkachuk testified that he could use the "PTO Pipeline" box for inventory transfers. Commonwealth asserts that the absence of any checked box on either Sales Acknowledgement form in the instant case indicates that an inventory transfer was not intended. Third, Commonwealth con-tends that it could not have intended an inventory transfer because it did not have an inventory account at Lake Underground in October 1982.[1]

Commonwealth's arguments do not provide us with sufficient basis for reversing the district court's finding. That Tkachuk checked the box in one case and not in another does not establish any course of dealing; it only proves that the five boxes on the form were not adequate, which is why Petrosol later changed its form so that the fifth box was "PTO Pipeline/Inventory Transfers." Additionally, the evidence indicates that Commonwealth did establish an account with Lake Underground, although ostensibly for another deal. The fact that Commonwealth did not have the transfer noted on its records at Lake Underground is not conclusive, for it might not have wanted such a transfer recorded during the time in which it received free storage. After hearing testimony from Tkachuk, Williams, and many other witnesses, the district court decided that the intent of the parties was for an inventory transfer, based upon its assessment of the evidence and the credibility of witnesses. This court will not disturb that finding.

### III.

Commonwealth contends that even if the transaction is an inventory transfer under section 1302.53(B), the parties entered into a "contrary agreement" under section 1302.53(D), thus nullifying the risk of loss provisions of subsection B. Commonwealth asserts two contrary agreements: paragraph 5 of the Sales Acknowledgement and the "F.O.B." term.

### A.

█ Paragraph 5 of the Sales Acknowledgements, quoted above, states that the title and the risk of loss passes to the buyer upon completion of one of a number of methods of delivery, including tank trucks, tank car or carrier, or as stipulated

---

**1.** Commonwealth also argues that Petrosol never proved that the propane was in Lake Underground, thus making the contract avoidable. We find this argument unpersuasive, for the disposition of the dispute between Cal Gas and Petrosol makes it clear that the propane was in Lake Underground at the time that the Confirmations were sent out.

on the face of the form. The district court found that paragraph 5 was "inapplicable under the facts of this case" because none of the methods listed in paragraph 5 were checked in the boxes on the first page of the form. Commonwealth argues that the district court misconstrued the meaning of paragraph 5. It notes that the methods of delivery listed in the boxes are not all listed in paragraph 5. Hence, Commonwealth contends that paragraph 5 could refer to any method of delivery mentioned on the first page of the Sales Acknowledgement. Commonwealth then asserts that since no other delivery method was specified on the first page, the risk of loss would not pass until one of the listed methods of delivery was accomplished. We reject Commonwealth's strained interpretation of paragraph 5. Though it states that the risk of loss passes to the buyer during certain types of delivery, paragraph 5 is clearly silent with respect to any other types of delivery. This silence cannot be construed as a contrary agreement under § 1302.53(D).

### B.

■ On the face of the Sales Acknowledgements, Petrosol noted that the price was "$0.58 USF/USG F.O.B. Lake Underground Storage." Commonwealth contends that this constituted a contrary agreement under section 1302.53(D). The district court found that there was no contrary agreement, though it did not make any specific notation of the "F.O.B." term. Ohio Rev.Code § 1302.32(A) provides:

(A) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which:

(1) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in section 1302.48 of the Revised Code and bear the expense and risk of putting them into the possession of the carrier. . . .

Commonwealth contends that under this section, Petrosol bore the risk of loss until it delivered the propane into the possession of Commonwealth at Lake Underground. In *Construction Helicopters, Inc. v. Heli-Dyne Systems, Inc.*, 875 F.2d 862 (6th Cir. 1989), this court noted that a major function of an F.O.B. term is to determine when the risk of loss shifts from the seller to the buyer. In *Consolidated Bottling Co. v. Jaco Equipment Corp.*, 442 F.2d 660, 662 (2d Cir.1971), the Second Circuit decided that the F.O.B. term is a contrary agreement which shifts the risk of loss to the seller under UCC 2-509(4) [O.R.C. 1302.-53(D)]. Under section 1302.32, the "F.O. B." term allocates risk of loss "unless otherwise agreed." Petrosol contends that the parties' intention of an inventory transfer is the agreement that takes the transactions out of section 1302.32. Commonwealth responds that there was no "other agreement" under section 1302.32. In *A.M. Knitwear Corp. v. All American Ex-Import Corp.*, 41 N.Y.2d 14, 390 N.Y.S.2d 832, 837, 359 N.E.2d 342, 347 (N.Y.Ct.App. 1976), the court held that in order to imply a meaning of "F.O.B." other than delivery to the carrier, there must be an "express statement varying the ordinary meaning." Because there is no express statement concerning the meaning of the F.O.B. term, Commonwealth argues that section 1302.32 controls on the issue of risk of loss.

Upon review of the arguments, we believe that the parties did make an agreement sufficient to render section 1302.32 inapplicable. Though *A.M. Knitwear* states that there must be an express agreement varying the ordinary meaning, in that case the goods were to be loaded into a container that would then be delivered to the buyer. Therefore, the plain meaning of "F.O.B. Plant" was delivery to the carrier. In contrast, in the instant case, the meaning of "F.O.B. Lake Underground" must be understood in light of the district court's finding that the parties intended an inventory transfer. We hold that the parties' intent to complete an inventory transfer is sufficient evidence of an "agreement" under section 1302.32. *See Crocker National Bank v. Ideco Division of Dresser Industries*, 839 F.2d 1104, 1107 (5th Cir.1988) (the court examined the intent of the par-

ties to determine whether there was an agreement other than delivery pursuant to the "F.O.B." term). Since section 1302.32 is inapplicable, the "F.O.B." term does not constitute a contrary agreement under section 1302.53(D).[2]

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.

2. Since we affirm on the basis of the district court's opinion, we do not reach Petrosol's cross-claims that the district court erred in admitting hearsay evidence and in failing to dismiss pursuant to the Fed.R.Civ.P. 41 motion filed by Petrosol.