QUALITY PORK INTERNATIONAL, APPELLEE, V. RUPARI FOOD SERVICES, INC., A FOREIGN CORPORATION, APPELLANT.

675 N.W.2d 642

Filed March 5, 2004.    No. S-01-1203.

Dave J. Skalka, of Law Offices of W. Patrick Betterman, for appellant.

Michael S. Degan and Angela M. Lisec, of Blackwell, Sanders, Peper & Martin, L.L.P., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Quality Pork International (Quality Pork) petitioned for further review of the decision of the Nebraska Court of Appeals which reversed the district court's judgment in favor of Quality Pork and remanded the cause with directions to dismiss. See *Quality Pork Intern. v. Rupari Food Services, Inc.*, No. A-01-1203, 2003 WL 21057297 (Neb. App. May 13, 2003) (not designated for permanent publication). The Court of Appeals concluded that the district court lacked personal jurisdiction over Rupari Food Services, Inc. (Rupari). *Id.*

## SCOPE OF REVIEW

■ When a jurisdictional question does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's. *Kugler Co. v. Growth Products Ltd.*, 265 Neb. 505, 658 N.W.2d 40 (2003).

■ When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Dean v. Yahnke*, 266 Neb. 820, 670 N.W.2d 28 (2003).

## BACKGROUND

Quality Pork (a Nebraska corporation which customizes pork products to order for its customers) sued Rupari (a Florida corporation involved in the importing, exporting, and manufacturing of food service and retail meat products) to recover the cost of goods sold under an alleged oral contract. The oral contract, which was arranged through a Colorado corporation, Midwest Brokerage (Midwest), provided that Quality Pork would ship products to Star Food Processing, Inc. (Star), a Texas food distributor. Rupari was to pay for the products shipped to Star. In November 1999, Midwest placed three orders with Quality Pork for products to be shipped to Star. According to Quality Pork, Rupari paid for the first two orders, but failed to pay for the third.

Quality Pork filed a petition on March 23, 2000, to recover the cost of the goods shipped under the third order. Rupari filed a special appearance challenging the district court's personal jurisdiction over it.

At a May 16, 2000, evidentiary hearing on Rupari's special appearance, Quality Pork offered the affidavit of Larry Lubeck, the chief executive officer of Quality Pork. Lubeck stated that beginning in March 1997, Quality Pork had established an ongoing business relationship in which Star purchased pork products from Quality Pork. In October 1997, Star's account became delinquent and Quality Pork discontinued selling to Star.

According to Lubeck, in November 1999, Midwest arranged an oral contract between Quality Pork and Rupari. Quality Pork agreed to again do business with Star only because Rupari agreed to pay for all products that Star ordered from Quality Pork. Under the terms of the contract, Midwest placed the orders with Quality Pork for Star, the orders were delivered to Star, and Rupari was sent the invoices for the orders.

With regard to the three orders at issue, Lubeck stated that Rupari "partially performed under the oral agreement with Quality Pork by making payments" of $43,736.84 and $47,467.80, and copies of the "check stubs" were attached to Lubeck's affidavit. Lubeck averred that Rupari failed to make the third payment for products ordered by Star and failed to abide by the terms of the contract.

Lubeck stated that he had spoken with Robert Mintz, the president of Rupari, and another Rupari representative on several occasions and had been assured that the delinquent amount would be paid. When Quality Pork made written demand upon Rupari for payment, Rupari failed to pay the $44,051.98 that was due.

The affidavit of Mintz stated that he was the president of Rupari at all times relevant to the proceedings and that Rupari was a corporation organized and existing by virtue of the laws of the State of Florida and headquartered in Deerfield Beach, Broward County, Florida. Mintz stated that Rupari is a food service company that sells and resells food products such as pork to retail operations and food brokers.

According to Mintz, Rupari never made any sales directly to or into the State of Nebraska, nor did it apply to become a foreign corporation authorized to do business in Nebraska. It did not have offices located in Nebraska, it did not own property in Nebraska, and at no time did any Rupari officer or employee visit Nebraska during the course of his or her employment with Rupari. Rupari is not a subsidiary or parent company of a subsidiary located or organized in Nebraska.

In a journal entry dated June 6, 2000, the district court overruled Rupari's special appearance.

On April 4, 2001, Quality Pork filed a second amended petition. On May 4, Rupari answered this petition, reserving its objection that the district court had no personal jurisdiction and raising the statute of frauds as an affirmative defense. Following a jury trial, the district court entered judgment for Quality Pork in the amount of $44,051.98 plus court costs. Rupari timely appealed.

## COURT OF APPEALS' OPINION

The Court of Appeals reversed the judgment of the district court and remanded the cause with directions to dismiss, concluding that the district court erred in determining that it had personal jurisdiction over Rupari. The Court of Appeals also concluded that Quality Pork had failed to prove the existence of a writing which would satisfy the statute of frauds and had failed to demonstrate Rupari's acceptance of the goods, which would therefore excuse the writing requirement of the statute of frauds.

## ASSIGNMENTS OF ERROR

In its petition for further review, Quality Pork asserts, summarized and restated, that the Court of Appeals erred in concluding that Rupari did not have sufficient contacts with the State of Nebraska to allow Nebraska courts to exercise personal jurisdiction over Rupari, in concluding that writings transmitted to Quality Pork by Rupari's agent did not satisfy the statute of frauds, and in concluding that Rupari did not accept each of the three shipments purchased from Quality Pork within the meaning of Neb. U.C.C. § 2-201(3) (Reissue 2001).

## ANALYSIS

### JURISDICTION

We first address whether the Court of Appeals erred in concluding that the district court lacked personal jurisdiction over Rupari. Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions. *Hunt v. Trackwell*, 262 Neb. 688, 635 N.W.2d 106 (2001). Before filing any other pleading or motion, one may file a special appearance for the sole purpose of objecting to a court's assertion or exercise of personal jurisdiction over the objector. *In re Interest of Rondell B.*, 249 Neb. 928, 546 N.W.2d 801 (1996).

Confronted with a special appearance, a plaintiff has the burden to establish facts which demonstrate the court's personal jurisdiction over the defendant. *Williams v. Gould, Inc.*, 232 Neb. 862, 443 N.W.2d 577 (1989). In a hearing on a special appearance, an affidavit may be used to prove or disprove the factual basis for a court's assertion or exercise of personal jurisdiction over a defendant. *Id.* When a jurisdictional question does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's. *Kugler Co. v. Growth Products Ltd.*, 265 Neb. 505, 658 N.W.2d 40 (2003).

Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536 (Reissue 1995), provides in relevant part:

A court may exercise personal jurisdiction over a person:

(1) Who acts directly or by an agent, as to a cause of action arising from the person:

(a) Transacting any business in this state;

. . . .

> (2) Who has any other contact with or maintains any other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

Section 25-536 suggests a broad application of the exercise of personal jurisdiction by the courts of this state, an application which is supported by case law. It was the intention of the Legislature to provide for the broadest allowable jurisdiction over nonresidents. *State on behalf of Yankton v. Cummings*, 2 Neb. App. 820, 515 N.W.2d 680 (1994). Nebraska's long-arm statute is to be interpreted broadly in view of the rationale and philosophy underlying its adoption. *General Leisure Products Corp. v. Gleason Corporation*, 331 F. Supp. 278 (D. Neb. 1971). Section 25-536 expressly extends Nebraska's jurisdiction over nonresidents having any contact with or maintaining any relation with Nebraska as far as the U.S. Constitution permits. *Castle Rose v. Philadelphia Bar & Grill*, 254 Neb. 299, 576 N.W.2d 192 (1998).

In *Williams*, we discussed the procedure that must be followed in determining whether a court can exercise jurisdiction under Nebraska's long-arm statute. Before a court can exercise personal jurisdiction over a nonresident defendant, the court must first determine whether a statutory standard of the long-arm statute is satisfied. *Id.* If the long-arm statute has been satisfied, the court must then determine whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process. *Id.*; *Dunham v. Hunt Midwest Entertainment*, 2 Neb. App. 969, 520 N.W.2d 216 (1994).

We conclude that the requirements of the long-arm statute were satisfied in this case because Rupari was transacting business in Nebraska. Lubeck's affidavit stated that in November 1999, Midwest arranged an oral contract between Quality Pork and Rupari whereby Rupari agreed to pay for all pork products ordered from Quality Pork by Star. Under the agreement, orders placed by Midwest were delivered to Star and Rupari was sent the invoices. With regard to the orders at issue, payments in the amounts of $43,736.84 and $47,467.80 were made by Rupari. Rupari did not pay for the third order, in the

amount of $44,051.98, and it is the subject of this action. This evidence establishes that Rupari, through Midwest, was transacting business in Nebraska. See § 25-536(1)(a).

We next consider whether minimum contacts exist between Rupari and the State of Nebraska such that personal jurisdiction may be exercised without offending due process. Due process for personal jurisdiction over a nonresident defendant requires that the defendant's minimum contacts with the forum state be such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" See *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). See, also, *Williams v. Gould, Inc.*, 232 Neb. 862, 443 N.W.2d 577 (1989); *McGowan Grain v. Sanburg*, 225 Neb. 129, 403 N.W.2d 340 (1987).

In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), the Court explained the protection afforded by due process as it relates to personal jurisdiction:

> The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." *International Shoe Co. v. Washington*, 326 U. S., at 319. By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," [citation omitted] the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S. 286, 297 (1980).

The Court held that

> this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.*, 465 U. S. 770, 774 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U. S. 408, 414 (1984).

*Burger King Corp.*, 471 U.S. at 472-73. Parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other state for the consequences of their activities. See *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647, 70 S. Ct. 927, 94 L. Ed. 1154 (1950).

*Burger King Corp.* stated several considerations that enter into the determination of whether a forum may legitimately exercise personal jurisdiction over a nonresident who has purposefully directed his activities toward residents of the forum. A state has a " 'manifest interest' in providing its residents with a convenient forum" for redress. *Burger King Corp.*, 471 U.S. at 473. It would be unfair to allow a nonresident to escape having to account for consequences that arise proximately from such activities. *Id.* "[T]he Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King Corp.*, 471 U.S. at 474. In addition, modern transportation and communication have made it much less burdensome for a party to defend himself in a state where he engages in economic activity. *Id.*

The constitutional touchstone is whether the defendant purposefully established minimum contacts in the forum state. *Id.* " '[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), quoting *Hanson v. Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ." *Burger King Corp.*, 471 U.S. at 475. The benchmark for determining if the exercise of personal jurisdiction satisfies due process is whether the defendant's minimum contacts with the forum state are such that the defendant should reasonably anticipate being haled into court there. *Castle Rose v. Philadelphia Bar & Grill*, 254 Neb. 299, 576 N.W.2d 192 (1998).

Two types of personal jurisdiction may be exercised depending upon the facts and circumstances of the particular case: general

personal jurisdiction or specific personal jurisdiction. These concepts were discussed in *Dunham v. Hunt Midwest Entertainment,* 2 Neb. App. 969, 520 N.W.2d 216 (1994). There, the Court of Appeals pointed out that a state may exercise either general or specific personal jurisdiction, so long as the defendant has sufficient contact with the forum state, citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). In the exercise of general personal jurisdiction, the plaintiff's claim does not have to arise directly out of the defendant's contacts with the forum state, provided that the defendant has engaged in "continuous and systematic general business contacts" with the forum state. See *Hall,* 466 U.S. at 416. If the defendant's contacts are neither substantial nor continuous and systematic, but the cause of action arises out of or is related to the defendant's contact with the forum, a court may assert "'specific jurisdiction'" over the defendant depending on the quality and nature of such contact. *Hall,* 466 U.S. at 414 n.8. Accord *Dunham, supra.*

Once it has been decided that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "'fair play and substantial justice.'" *Burger King Corp.,* 471 U.S. at 476. These considerations include "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" *Burger King Corp.,* 471 U.S. at 477, quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). Such considerations "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King Corp.,* 471 U.S. at 477.

In the case at bar, the Court of Appeals was presented with the question of whether there were sufficient minimum contacts between Rupari and the State of Nebraska to assert either general personal jurisdiction or specific personal jurisdiction over

Rupari. As to the exercise of general personal jurisdiction, the Court of Appeals found that Rupari's activities did not qualify as substantial or continuous and systematic. The court stated that "[t]he most that can be said is that Rupari allegedly engaged in business with Quality Pork" by having Quality Pork ship products to Texas and that "Rupari sent two payments to Quality Pork in Nebraska." See *Quality Pork Intern. v. Rupari Food Services, Inc.*, No. A-01-1203, 2003 WL 21057297 at *4 (Neb. App. May 13, 2003) (not designated for permanent publication). The court also concluded that the record did not indicate that Rupari's activities qualified as a purposeful availment that would satisfy the requirements of specific personal jurisdiction.

We disagree with the Court of Appeals' determination as to purposeful availment. To determine whether a defendant's contract supplies the contacts necessary for personal jurisdiction in a forum state, a court is to consider the parties' prior negotiations and future contemplated consequences, along with the terms of the contract and the parties' actual course of dealing. *Castle Rose v. Philadelphia Bar & Grill*, 254 Neb. 299, 576 N.W.2d 192 (1998), citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Williams v. Gould, Inc.*, 232 Neb. 862, 443 N.W.2d 577 (1989). Whether a forum state court has personal jurisdiction over a nonresident defendant depends on whether the defendant's contacts with the forum state are the result of unilateral acts performed by someone other than the defendant, or whether the defendant himself has acted in a manner which creates substantial connections with the forum state, resulting in the defendant's purposeful availment of the benefits and protections of the law of the forum state. See, *Burger King Corp., supra*; *Williams, supra*.

In this case, Rupari induced Quality Pork to ship products to Star. Quality Pork had previously ceased doing business with Star because of its poor credit. Based upon Rupari's promise to pay for products shipped to Star, Quality Pork filled orders valued at $43,736.84, $47,467.80, and $44,051.98 respectively.

Quality Pork's claim arose out of Rupari's contacts with a company located in Nebraska. Therefore, in evaluating whether the exercise of specific personal jurisdiction is reasonable, we conclude that it would not be unduly burdensome for Rupari to

defend an action in Nebraska. Quality Pork had a valid interest in obtaining convenient and effective relief which supported the bringing of its action in this state. By purposefully conducting business with Quality Pork, Rupari could reasonably anticipate that it might be sued in Nebraska if it failed to pay for products ordered from Quality Pork.

Where a defendant who has purposefully directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other consideration would render jurisdiction unreasonable. *Burger King Corp., supra.* Rupari has failed to present such a case. The affidavit of Rupari's president merely set forth that it is a food servicing company which sells and resells food products such as pork and that it does not have employees, offices, or property in the State of Nebraska. Under the facts of this case, the lack of physical presence in Nebraska is not a compelling reason that would cause the assertion of jurisdiction to be unreasonable.

We conclude that Rupari had sufficient minimum contacts with Nebraska to satisfy the due process requirements for the exercise of specific personal jurisdiction. The district court had specific personal jurisdiction over Rupari, and the Court of Appeals erred in holding that it did not.

### STATUTE OF FRAUDS

Rupari's answer to Quality Pork's second amended petition and Rupari's motion for directed verdict asserted that the oral contract between Quality Pork and Rupari was unenforceable under the statute of frauds because it was an oral agreement and Rupari did not accept the goods from Quality Pork. In its petition for further review, Quality Pork asserts that the Court of Appeals erred in concluding that writings transmitted to Quality Pork by Rupari's agent did not satisfy the statute of frauds and in concluding that Rupari did not accept each of the three shipments within the meaning of § 2-201(3).

The statute of frauds provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract

for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

§ 2-201(1).

Although the purchase orders bore the caption "Star Food Processing, Inc.," and requested shipment of the products to Star in San Antonio, Texas, the Court of Appeals found nothing on the purchase orders that would satisfy the requirement that the writing be "signed by" Rupari. See § 2-201(1). The court concluded that Quality Pork had failed to demonstrate the existence of a sufficient writing to satisfy the statute of frauds and had failed to demonstrate that Rupari accepted the goods, which would excuse the writing requirement.

Section 2-201(3) provides for situations in which an oral contract is enforceable in the absence of an adequate writing:

A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

. . . .

(b) if the party against whom enforcement is sought admits in his or her pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 2-606).

Neb. U.C.C. § 2-606 (Reissue 2001) provides:

(1) Acceptance of goods occurs when the buyer

. . . .

(b) fails to make an effective rejection (subsection (1) of section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

In its second amended petition, Quality Pork claimed that Rupari accepted the products, because the products were not rejected within a reasonable time after delivery. Rupari asserted in its answer that it never received or accepted the products from Quality Pork.

The question of whether the oral contract between Quality Pork and Rupari was sufficient to satisfy the statute of frauds is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Dean v. Yahnke*, 266 Neb. 820, 670 N.W.2d 28 (2003). We conclude that the record before us establishes that Rupari accepted the goods, which acceptance would excuse the fact that the purchase orders were not "signed by" Rupari. Acceptance of goods occurs when the buyer does any act inconsistent with the seller's ownership. § 2-606(1)(c).

At trial, Lubeck, the chief executive officer of Quality Pork, testified that the business typically does not use formal written agreements to conduct transactions, but, rather, uses purchase orders. Quality Pork shipped truckloads of pork to Star on November 8, 11, and 17, 1999, pursuant to the oral contract with Rupari. Prior to each shipment, a representative of Midwest faxed a written purchase order to Quality Pork specifying the type and quantity of meat ordered and specifying delivery to Star. The purchase orders described the product, the price, the name of the vendor, the shipping location, and the date of delivery.

In addition, at no time did any representative of Star or Rupari voice an objection to the quality or quantity of goods delivered by Quality Pork pursuant to the purchase orders. The record establishes that Rupari sent an invoice to Star for each truckload delivered. These invoices reflect a markup above the prices charged by Quality Pork. Rupari also paid Midwest a commission on each of the three shipments.

The following transactions are reflected in the record: On November 8, 1999, Midwest sent an invoice to Rupari for a commission based upon 41,620 pounds of pork at .005 cents per pound. Quality Pork sent an invoice to Rupari on November 9 in the amount of $43,736.84 for 41,620 pounds of pork shipped November 8. Rupari sent an invoice to Star on November 16 in

the amount of $45,810.60 for 41,620 pounds of pork. Star wrote a check to Rupari for $45,810.60 on November 24, and in turn, Rupari paid Quality Pork for this first shipment.

On November 10, 1999, Midwest sent an invoice to Rupari for a commission based upon 44,988 pounds of pork shipped to Star at .005 cents per pound. On November 15, Quality Pork sent an invoice to Rupari in the amount of $47,467.80 for 44,988 pounds of pork shipped November 11. Rupari sent an invoice to Star on November 17 in the amount of $51,158.76 for 44,988 pounds of pork. Rupari subsequently paid Quality Pork for this second shipment.

On November 22, 1999, Midwest sent an invoice to Rupari for a commission based upon 42,062 pounds of pork at .005 cents per pound shipped to Star. The record reflects that Quality Pork sent an invoice to Rupari on December 2 in the amount of $44,051.98 for 42,062 pounds of pork and that Rupari sent an invoice to Star on December 1 in the amount of $47,644.14 for 42,062 pounds of pork.

On February 1, 2000, Brian Trimbach of Rupari sent a fax to Lubeck of Quality Pork, stating:

Hello Larry —

My employer has authorized me to write this communique regarding Rupari's withholding of payments due Quality Pork International.

Following our representative's visit to Star Foods['] plant and meetings with the owner of Star, we feel confident that payment due Rupari is forthcoming. That is, Star's problem appears to be of a cash flow nature and not insolvency.

Based on this, we anticipate a relatively short continuation of what we all agree to be unpleasant and look foreward [sic] to full payment from Star and the consequent issuance of monies due your company.

The invoices sent by Rupari to Star requesting payment for the product that had been shipped by Quality Pork demonstrate acts inconsistent with Quality Pork's ownership of the product. See § 2-606(1)(c). In addition, the invoice from Rupari to Star dated December 1, 1999, evidences Rupari's acceptance of the third shipment and "indicate[s] that a contract for sale has been made between the parties." See § 2-201(1). Thus, Quality

Pork's evidence was sufficient to satisfy the requirements of the statute of frauds. See, *Commonwealth Propane Co. v. Petrosol Internat., Inc.*, 818 F.2d 522 (6th Cir. 1987) (party resold propane, which was act so inconsistent with seller's ownership as to constitute acceptance within meaning of Ohio Rev. Code Ann. § 1302.64(A)(3) (Anderson 1979)); *Matter of Pennsylvania Tire Co.*, 26 B.R. 663 (N.D. Ohio 1982) (when contract buyer has performed act inconsistent with seller's ownership of specific goods by offering to resell those goods, such act constitutes acceptance of goods).

## CONCLUSION

For the reasons set forth herein, the decision of the Court of Appeals is reversed, and the cause is remanded with directions to reinstate the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.

CONNOLLY, J., dissenting.

I disagree with the conclusion that Rupari had sufficient contacts with Nebraska to allow Nebraska courts to exercise personal jurisdiction. I would affirm the decision of the Nebraska Court of Appeals and remand the cause with directions to dismiss.

The evidence presented at the special appearance consisted of only two affidavits. Robert Mintz, the president of Rupari, located in Florida, averred that Rupari had never made sales in Nebraska, was not a Nebraska corporation, did not have offices in Nebraska, and its employees had never visited Nebraska in the scope of their employment. Larry Lubeck, the chief executive officer of Quality Pork, averred that Quality Pork had established an ongoing business relationship with Star, located in Texas. Star became delinquent on its account, and Quality Pork discontinued selling products to Star. Lubeck averred that Midwest, located in Colorado, had arranged an oral agreement between Quality Pork and Rupari whereby Rupari agreed to pay for pork products ordered by Star. The record at the special appearance is silent about how the contract was arranged or whether Rupari ever directly called Quality Pork to agree to the contract. The orders were delivered to Star in Texas, and Rupari was invoiced for them. Rupari made two payments and then failed to pay. Quality Pork spoke to a representative of Rupari on several occasions

after the default. The affidavits do not state who initiated the communications. Thus, the record at the special appearance shows that Rupari's only clear contact with Nebraska was writing two checks to Quality Pork and orally agreeing through a broker to pay for purchases made by another entity.

The burden of proof rests upon the plaintiff confronted with a special appearance to demonstrate the court's personal jurisdiction over the defendant. *Castle Rose v. Philadelphia Bar & Grill*, 254 Neb. 299, 576 N.W.2d 192 (1998).

Before a court can exercise personal jurisdiction over a nonresident defendant, the court must first determine whether the long-arm statute is satisfied. If the long-arm statute is satisfied, the court must then determine whether minimum contacts exist between the defendant and the forum, allowing a court to exercise personal jurisdiction without offending due process. See, *Crete Carrier Corp. v. Red Food Stores*, 254 Neb. 323, 576 N.W.2d 760 (1998); Neb. Rev. Stat. § 25-536 (Reissue 1995). The long-arm statute expressly extends Nebraska's jurisdiction over nonresidents to the extent permitted by the U.S. Constitution. *Crete Carrier Corp., supra*; *Castle Rose, supra*; § 25-536(2). Thus, I consider only whether Rupari had sufficient minimum contacts with Nebraska so that the exercise of personal jurisdiction would not offend constitutional principles of due process. See *Crete Carrier Corp., supra.*

The consideration of due process involves two steps. First, it must be determined whether the defendant has sufficient minimum contacts. Second, if such minimum contacts are established, the contacts may be considered in the light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *Crete Carrier Corp., supra.* Such factors include the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Crete Carrier Corp., supra.*

The benchmark for determining if the exercise of personal jurisdiction satisfies due process is whether the defendant's minimum contacts with the forum state are such that the defendant should reasonably anticipate being haled into court there. *Crete Carrier Corp., supra*; *Castle Rose, supra*. This analysis requires that we consider the quality and nature of the defendant's activities to determine whether the defendant has the necessary minimum contacts with the forum to satisfy due process. *Crete Carrier Corp., supra*, citing *Internat. Shoe Co., supra*.

Due process does not require a defendant's physical presence in the forum before jurisdiction is exercised. *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992); *Crete Carrier Corp., supra*. However, the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state. *Burger King Corp., supra*; *Crete Carrier Corp., supra*; *Castle Rose, supra*. Rather, the claim must arise out of or relate to the defendant's forum-related activities. *Burger King Corp., supra*. Additionally, it is essential in each case that there be some act by which the defendant purposely avails himself or herself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws. *Burger King Corp., supra*; *Crete Carrier Corp., supra*; *Castle Rose, supra*. These requirements ensure that a defendant will not be subject to litigation in a jurisdiction solely because of random, fortuitous, or attenuated contacts. *Id.* Thus, action by Rupari, itself, must have created a " 'substantial connection' " with the forum. See *Bell Paper Box, Inc. v. Trans Western Polymers*, 53 F.3d 920, 922 (8th Cir. 1995), quoting *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957).

We have specifically stated that a contract with a party in Nebraska does not, in and of itself, provide the necessary contacts for personal jurisdiction. *Castle Rose v. Philadelphia Bar & Grill*, 254 Neb. 299, 576 N.W.2d 192 (1998). See, also, *Burger King Corp., supra*. When dealing with contracts, it is the prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, that must be evaluated in determining whether a defendant purposely

established minimum contacts within the forum. *Crete Carrier Corp. v. Red Food Stores*, 254 Neb. 323, 576 N.W.2d 760 (1998).

" 'Merely entering into a contract with a forum resident does not provide the requisite contacts between a [nonresident] defendant and the forum state.' " *Bell Paper Box, Inc.*, 53 F.3d at 922. "This is particularly true when the nonresident defendant is a buyer, rather than a seller." *Id.* See, also, *Vetrotex Certainteed v. Consolidated Fiber Glass*, 75 F.3d 147, 152 (3d Cir. 1996) (contacts of mere " 'passive buyer' " insufficient to satisfy due process).

When the defendant is a buyer, contacts with the forum are often too attenuated to satisfy the exercise of personal jurisdiction. Unlike situations involving sellers—who often directly solicit buyers in a forum and perform a large portion of a contract in the forum through delivery—buyers often do little more than place an order; communicate via telephone, facsimile, or e-mail; and send payment for the product. Courts have held that such contacts are ancillary and are insufficient to satisfy due process. See, *Vetrotex Certainteed, supra*; *Bell Paper Box, Inc., supra*; *Nicholas v. Buchanan*, 806 F.2d 305 (1st Cir. 1986); *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055 (11th Cir. 1986); *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983); *Lakeside Bridge & Steel v. Mountain State Const.*, 597 F.2d 596 (7th Cir. 1979); *TRWL Financial Estab. v. Select Intern.*, 527 N.W.2d 573 (Minn. App. 1995). See, generally, *Bellboy Seafood v. Kent Trading Corp.*, 484 N.W.2d 796 (Minn. 1992); *Quelle Quiche v. Roland Glass Foods*, 926 S.W.2d 211 (Mo. App. 1996), *overruled on other grounds, Chromalloy American v. Elyria Found.*, 955 S.W.2d 1 (Mo. 1997).

As one court has noted:

> "The cases have distinguished . . . between the quality of contacts of buyers and sellers. The distinction is based primarily on the traditional scenario in which the seller is the aggressor in the interstate relationship; the seller solicits customers, advertises, or otherwise initiates the dealings. Where the buyer is the aggressor, however, its buyer status will not protect it."

*TRWL Financial Estab.*, 527 N.W.2d at 577. For the buyer to be the aggressor, it must be the dominant party in pursuing the transaction. See *id.*

Courts have further held that performance of contractual obligations by the seller cannot serve as a sufficient contact to confer jurisdiction over the out-of-state purchaser when the contract does not require the purchaser to perform in the forum state. Payment for goods in the forum state is generally not sufficient in and of itself to create the contacts necessary to assert personal jurisdiction. See, e.g., *Borg-Warner Acceptance Corp., supra*; *Hydrokinetics, Inc., supra*; *Lakeside Bridge & Steel, supra*. When negotiation for the contract took place over the telephone and delivery occurred outside the forum, courts have found insufficient contacts to satisfy due process. See, e.g., *TRWL Financial Estab., supra*; *Nicholas, supra*. In addition, contacts made after a failure to pay or rejection of goods are generally considered ancillary and cannot act to confer jurisdiction. See, e.g., *Borg-Warner Acceptance Corp., supra*.

In *Bell Paper Box, Inc. v. Trans Western Polymers*, 53 F.3d 920 (8th Cir. 1995), Bell Paper Box, Inc. (Bell), a South Dakota corporation that manufactures printed cartons, used a broker in California who solicited business from Trans Western Polymers, Inc. (Trans Western), a California corporation. Bell and Trans Western communicated by telephone, facsimile, and mail, with some communications routed through the broker. Trans Western sent Bell a purchase order and films that were necessary for Bell to manufacture cartons for Trans Western. The parties agreed that the contract would be construed in accordance with South Dakota law. Trans Western canceled the purchase order, and Bell filed suit in South Dakota.

The district court held that Trans Western lacked sufficient minimum contacts with South Dakota. The Eighth Circuit affirmed on appeal. The court noted that Trans Western did not itself have substantial contacts with the forum. Instead, Bell employed a broker in California who solicited the purchase order, and delivery of the product was to occur outside of South Dakota. Although films were sent, no raw materials were shipped into the forum, Trans Western had no physical presence in the forum, and Trans Western only communicated through interstate communications. The court did not find the choice-of-law clause persuasive. Thus, the court concluded that the use of interstate facilities such as telephone or mail was a " 'secondary

or ancillary' factor" that alone could not provide the necessary minimum contacts. *Id.* at 923.

In *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), the plaintiff Hydrokinetics, Inc., was a manufacturer in Texas. The defendant Alaska Mechanical, Inc., an Alaska corporation, was contacted by Alaska Winter, a manufacturer's representative, who initially brokered all communications between the parties. Using telex, telephone, and letter, the parties negotiated a contract for Alaska Mechanical to purchase products manufactured by Hydrokinetics. The contract stipulated that it would be governed by Alaska law. Two officers of Alaska Mechanical twice visited Hydrokinetics in Texas. The products were shipped to Washington and then to Alaska. Alaska Mechanical rejected the goods, and Hydrokinetics filed suit in Texas.

The district court concluded that Texas could not assert personal jurisdiction over Alaska Mechanical. On appeal, Hydrokinetics argued that Alaska Mechanical purposely availed itself of the benefits of Texas laws because (1) it agreed to purchase specific goods manufactured in Texas, (2) payment was to take place in Texas, (3) there were extensive communications between the parties, (4) an officer visited Hydrokinetics in Texas, and (5) the contract was accepted in Texas.

The Fifth Circuit affirmed. The court noted that although Alaska Mechanical agreed to purchase products manufactured in Texas, no performance of the contract by Alaska Mechanical was to take place in Texas with the exception of payment. The court stated that it did not weigh heavily the fact that checks might have been mailed to Texas. Instead, the court viewed the activity in Texas as unilateral activity by Hydrokinetics. The court also discounted the interstate communications between the parties. Although officers of Alaska Mechanical visited Hydrokinetics twice and accepted the contract there, the court concluded that the significance of the visits was diminished because the case involved a single transaction with a contract governed by Alaska law.

In comparison to *Bell Paper Box, Inc. v. Trans Western Polymers*, 53 F.3d 920 (8th Cir. 1995), and *Hydrokinetics, Inc., supra*, cases which have found sufficient contacts to assert personal jurisdiction over a buyer include more substantial contacts.

For example, in *Command-Aire v. Ontario Mechanical Sales & Service*, 963 F.2d 90 (5th Cir. 1992), the case involved (1) a lengthy course of dealing between the parties, (2) the president of the defendant buyer corporation traveling to the forum for the purpose of specifically tailoring the manufacture of products to its needs, and (3) the buyer's taking possession of the goods in the forum so that title passed there. Distinguishing the case from *Hydrokinetics, Inc., supra*, the court held that the contacts were no longer mostly unilateral on the part of the plaintiff and that the contacts were sufficient to confer jurisdiction.

Likewise, where the plaintiff seller had to retool machinery to custom make a product and entered into a contract contemplating a long-term and ongoing business relationship, contacts have been deemed sufficient to assert personal jurisdiction over an out-of-state buyer. *Precision Lab. Plastics v. Micro Test*, 96 Wash. App. 721, 981 P.2d 454 (1999).

Here, Quality Pork has failed to meet its burden of proof to show that Rupari had sufficient contacts with Nebraska to satisfy due process. Rupari's only clear contacts with Nebraska were its agreement to pay for pork products to be sent to a third party in Texas, its act of mailing two checks to Nebraska, and two telephone communications with a representative of Quality Pork after the default.

The majority concludes that there were sufficient contacts because "Rupari induced Quality Pork to ship products to Star" when it agreed to pay for the products. The majority next concludes that Quality Pork's claim arose out of Rupari's contacts with a Nebraska company and that it would not be unduly burdensome for Rupari to defend an action in Nebraska. But the record is silent about who pursued the contract or who was the aggressor. All that is known is that an oral contract was arranged through a broker in Colorado and that Star placed orders for products for which Rupari was invoiced. An order for products and promise to pay is not the type of "inducement" that the case law envisions could create sufficient minimum contacts. See, e.g., *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055 (11th Cir. 1986); *Lakeside Bridge & Steel v. Mountain State Const.*, 597 F.2d 596 (7th Cir. 1979); *TRWL Financial Estab. v. Select Intern.*, 527 N.W.2d 573 (Minn. App. 1995). If the view of

the majority is followed, a mere purchaser, by simply agreeing to pay, would always be subject to suit in the seller's state. Such a concept is unsupported by the case law. See *id.*

The record from the special appearance hearing shows that Rupari was nothing more than a mere purchaser, and even then, an attenuated purchaser, because the products were sent to a third party. The case law does not support the exercise of jurisdiction in such a situation. Indeed, in cases with clearer and substantially more contacts, courts have found that personal jurisdiction could not be satisfied without offending due process.

Further, Quality Pork has failed to show that the contract was formed, accepted, or required performance by Rupari in Nebraska other than sending payment. A broker in Colorado arranged the contract. The record is silent about where the actual contract formation took place, but the inference is that it was by telephone or other interstate communication. Outside of payment, Rupari had no contact with Nebraska to perform under the contract. The product was delivered to a company in Texas, and Rupari never traveled to Nebraska to complete or perform the contract. It is Rupari's actions in the forum that must be considered. Quality Pork's actions of performing the contract in the forum cannot confer jurisdiction over Rupari, who primarily acted outside the forum. See *Bell Paper Box, Inc. v. Trans Western Polymers*, 53 F.3d 920 (8th Cir. 1995). Two telephone calls were made after Rupari failed to pay. Those contacts were ancillary and cannot support the exercise of personal jurisdiction. See *Borg-Warner Acceptance Corp., supra.*

Finally, the majority's conclusion that it would not be unduly burdensome for Rupari to defend the action in Nebraska is irrelevant. The burden on the defendant to defend the suit is not part of the minimum contacts analysis. Instead, if minimum contacts are shown, then the burden on the defendant is one of the factors considered to determine whether the exercise of jurisdiction comports with notions of fair play and substantial justice. Because there were not sufficient minimum contacts, the burden on Rupari to appear and defend the suit is irrelevant.

This is not a case where the seller met the burden of proof by showing that a buyer was the main aggressor in the transaction or one involving custom products that required additional work by

the seller in the forum state. See *Command-Aire v. Ontario Mechanical Sales & Service*, 963 F.2d 90 (5th Cir. 1992). Nor did Quality Pork show that the parties contemplated a long-term relationship with numerous interstate communications. See *Precision Lab. Plastics v. Micro Test*, 96 Wash. App. 721, 981 P.2d 454 (1999). See, generally, *Crete Carrier Corp. v. Red Food Stores*, 254 Neb. 323, 576 N.W.2d 760 (1998).

Instead, Rupari's contacts with Nebraska are attenuated and ancillary. Case law does not support the exercise of personal jurisdiction under the facts as presented at the special appearance. I find no support for the exercise of personal jurisdiction. Accordingly, I would affirm the decision of the Court of Appeals and remand the cause with directions to dismiss.